110 So.2d 250

Jessie W. **MABRY**

v.

**STATE.**

6 Div. 628.

Court of Appeals of Alabama.

Jan. 6, 1959.

Rehearing Denied Feb. 10, 1959.

Griffin & Wilson and Wm. W. Conwell, Birmingham, for appellant.

John Patterson, Atty. Gen., and John F. Proctor, Asst. Atty. Gen., for the State.

HARWOOD, Presiding Judge.

This appellant has been adjudged guilty of mayhem, an offense denounced by Section 359, Title 14, Code of Alabama 1940. Punishment was fixed at imprisonment in the penitentiary for a term of twenty years, the maximum permissible under said section.

The victim of the mayhem was Judge Edward Aaron, who suffered castration.

The evidence presented below depicts conduct shocking in its foulness, viciousness, and savage brutality.

Without dispute the evidence shows that late on the afternoon of 2 September 1957,

a group gathered in the yard of appellant's home. Included in this group were the appellant, Joe Pritchett, Bart Floyd, John Griffin, Bill Miller, and Grover McCullough.

Among the things discussed was the election of a "captain" for the group. Bart Floyd was a prospect for this office. However, it was thought that Floyd should "prove" his leadership before being elected.

To enable Floyd to establish his qualifications it was decided that the group would go out and "grab a negro," or "grab a negro and scare hell out of him."

The group set out on this mission in two automobiles. Appellant was in a car driven by John Griffin, in which Bill Miller was also a passenger.

At one point a stop was made by the two cars and Bart Floyd went into a drug store and emerged with a small package. While appellant denied he knew the contents of the package, other evidence shows that it contained razor blades and turpentine.

Driving around, apparently at random, the group came upon Aaron walking along the Huffman-Tarrant City road, accompanied by Cora Parker.

Aaron was forced into one of the cars and made to lie upon the rear floor.

Although at this point the appellant took over as driver of the car into which Aaron had been forced, he claimed in his testimony that he did not know what force had been used to get Aaron into the car as he had kept his face to the front in order to avoid any later identification. He did however admit furnishing his handkerchief to be used to blindfold Aaron.

With appellant driving the lead car, the two cars proceeded to a concrete block house, on the outskirts of Birmingham, used as a meeting hall for the group. Hoods were procured for the group to put on. Aaron was made to crawl into the house, guided by Pritchett and followed by appellant.

Inside the house Aaron was questioned, and during the process was kicked in the face by Pritchett. Eventually he was asked if he "wanted his life or his testicles." Appellant testified he heard this part of the questioning.

Aaron was forced to remove his trousers and shorts, some scuffling ensuing at this junction. According to Aaron he was struck on the head with a pistol by the appellant, and also hit by someone else. According to other evidence introduced by the State, he was hit on the head with a tire tool by another of the group and knocked unconscious. Pritchett then commanded Floyd to do his duty.

Floyd proceeded to castrate Aaron with a razor blade, excising the entire scrotum and contents in the process.

After about five minutes Aaron was assisted to one of the cars and put in the trunk compartment. The appellant left the meeting hall in this car. Driving to a remote area, Aaron was removed from the car and left on the road. A few hours later he was discovered by two police officers of the City of Birmingham and taken to a hospital. After lingering between life and death for some two weeks Aaron eventually recovered.

In general, the State's case was presented on the theory of appellant's guilt as a conspirator.

The defense was directed toward an attempt to show that if a conspiracy ever existed, it was merely to "scare a negro," and that Floyd's act was his own independent act, beyond the scope of any original conspiracy entered into by the appellant, and therefore an act for which the appellant should not be held responsible.

Examining the undisputed facts in the light of appellant's contention we find:

1. The first meeting of the group was in appellant's yard.

2. It was here agreed they would go out and "grab a negro," or "scare a

negro," or "scare hell out of a negro," any and all of which acts were unlawful.

3. Upon the seizure of Aaron the appellant drove the automobile into which Aaron had been forced, and though, according to appellant, not directed by anyone to do so, drove the car to the meeting hall.

4. The appellant followed the crawling Aaron into the hall.

5. There, with appellant present, Aaron was asked by Pritchett if he wanted "his life or his testicles," and upon replying he wanted both, being kicked in the face.

6. In the short struggle ensuing this, Aaron was knocked unconscious by a blow on the head with an iron instrument.

7. Appellant assisted in replacing Aaron's clothing after the mutilation, and assisted in placing him in the trunk of a car, in which appellant rode, and from which car Aaron was later removed on a remote road and abandoned.

■ In general a conspiracy comes into being "when two or more persons enter upon an unlawful enterprise with a common purpose to aid, assist, advise, or encourage each other in whatever may grow out of the enterprise upon which they enter, each is responsible civilly and criminally for everything which may consequently and proximately result from such unlawful purpose, whether specifically contemplated or not, and whether actually perpetrated by all or less than all of the conspirators." Martin v. State, 89 Ala. 115, 8 So. 23, 24; Cleveland v. State, 20 Ala.App. 426, 103 707, 709; Carlisle v. State, 36 Ala.App. 241, 58 So.2d 638.

■ As pointed out in the Martin case, supra: "It should be observed however, that while the parties are responsible for consequent acts growing out of the general design, they are not for independent acts growing out of the particular acts of individuals."

Counsel for appellant argues that the castration of Aaron must be considered as the malicious independent act of Floyd, for which appellant was not responsible, because not within the scope of the agreement to "scare a negro."

■ Such argument overlooks the undisputed facts that after Aaron was in the meeting house he was asked by Pritchett if he wanted his life or his testicles. Appellant admits hearing this question propounded, and that he heard a scuffle. That he had been up to his neck in this unlawful enterprise up to this point cannot be denied. The purpose of the conspiracy from this point on became crystal clear. The appellant made no objections to its execution, and no effort towards its prevention. He would seek to escape responsibility by saying that he turned his head and did not see the actual overt act.

■ The common enterprise essential to a conspiracy need not exist for any definite length of time prior to the execution of the unlawful act, Eaton v. State, 8 Ala.App. 136, 63 So. 41; Bailey v. State, 11 Ala.App. 8, 65 So. 422, and a conspiratorial agreement may arise on the spur of the moment. Newsom v. State, 15 Ala.App. 43, 72 So. 579.

■ Appellant's argument in this aspect is without merit. The jury was not without evidence from which it could reasonably infer this appellant's guilt as charged. Indeed the evidence is compelling that he was.

The court therefore did not, in this aspect of the case, err in overruling appellant's motion to exclude the evidence and discharge the appellant, nor in refusing appellant's requested written charges which were affirmative in nature, nor in overruling his motion for a new trial on the grounds going to the sufficiency of the evidence.

During the course of the trial counsel for appellant moved the court to require

the State to produce all written material in the hand of the Solicitor containing statements made by Aaron, Griffin or Miller, witnesses for the State, in order to afford the appellant a basis for full cross examination of the respective witnesses. In connection with the motion to produce any written statements made by Aaron, the further ground was assigned that Aaron had made inconsistent statements.

The court denied all such motions.

It appears that during the investigation of this case various parties were interviewed by investigating officers. Written notes or memoranda were made by the investigating officers during these interviews. None of the witnesses knew the contents of the notes written by the officers, they not being read back, nor was anything signed by the witnesses.

In connection with the inconsistent statements attributed to Aaron the record shows that during the progress of the trial defense counsel asked Aaron, while Aaron was in court but not on the witness stand, if the appellant was in the building at the time of the castration, and Aaron had said he was not. On cross examination Aaron testified he had so told defense counsel, but reiterated that the appellant was present at the time despite the statement he had made to defense counsel. This does not constitute any inconsistency between Aaron's testimony and any statement he may have made to the investigating officers, but only an inconsistency between Aaron's testimony and what he stated to defense counsel. Since the appellant himself testified he was in the building the entire time there is certainly no inconsistency between Aaron's testimony and that of the appellant in this regard.

■ This court, in two cases, has held that it is within the discretion of the trial court as to whether a prosecuting officer will be compelled to turn over to the defense written notes made by officers during the investigation of a crime. See Vaughn v. State, 25 Ala.App. 204, 143 So. 211; Bailey v. State, 24 Ala.App. 339, 135 So. 407. See also 156 A.L.R. 345–355. Since actually the only real contradiction between the evidence presented by the State, and that presented by the defense in this trial arises from whether the act of castration was beyond the scope of the conspiracy, we can see no possible abuse of the court's ruling in this instance.

Further, it is the holding of a majority of the highest courts of our sister States that it is not error for a trial court to refuse to order a prosecuting attorney to produce and make available for inspection by an accused statements given by the State's witnesses to the prosecuting attorney. A definitive opinion on the point now under consideration was recently handed down by the Supreme Court of Mississippi, Bellew v. State, Miss., 106 So.2d 146. The authorities are therein review and analyzed, and we recommend a reading of this opinion to those interested.

Perhaps the answer is best summarized in a statement by Cardozo, C. J., in People ex rel. Lemon v. Supreme Court of State of New York, 245 N.Y. 24, 156 N.E. 84, 85, 52 A.L.R. 200, wherein he observed:

"Documents are not the subject to inspection for the mere reason that they will be useful in supplying a clew whereby evidence can be gathered. Documents to be subject to inspection must be evidence themselves."

Clearly, the mere memoranda sought in this case, made by investigators during the course of an interview, not read by the witnesses interviewed, and not signed or adopted by them in any way cannot be considered evidence.

In his argument in support of the alleged error resulting from denying the motion to produce the statement in the hands of the Solicitor, counsel relies upon Parsons v. State, 251 Ala. 467, 38 So.2d 209, and Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103.

The facts and legal principles enunciated in the Parsons case, supra, are so different from the present case as to render it inapplicable.

As to the Jencks case, supra, the majority opinion was reached upon the basis of the "standards for the administration of criminal justice in the federal courts." No constitutional provision was invoked.

If it be argued that by inference the due process required by the Fifth Amendment of the United States was implicit in the ruling, and therefore that the Fourteenth Amendment must be considered in a case arising in a State court, as well of course as the due process clause of the Alabama Constitution, we answer that these due process provisions have never been deemed to apply by an overwhelming majority of the State courts.

Even so, following the Jencks decision, and to meet its broad implications, the United States Congress enacted a statute (18 U.S.C.A. § 3500) declaring, among other things, that the term "statement" means: "A written statement made by said witness and signed or otherwise adopted or approved by him."

■ This enactment clearly answers any contention that the nonproduction of the statements sought in this case was violative of the due process clause of the Fourteenth Amendment of the federal constitution. Nor do we think it violative of the due process clause of Section 6 of our Alabama Constitution, in view of the former holdings of this court, and of the courts of our sister States. See Bellew v. State, supra.

No error resulted from the sustention of the State's objection to a question propounded to defense witness Mrs. Joe Pritchett, on her direct examination as to whether she knew that Floyd had been drinking on the day in question.

Mrs. Pritchett had not seen Floyd since he left her home around 6:30 that afternoon.

■ The evidence sought possessed no tendency to prove, or disprove, the issues being litigated. The objection was properly sustained. Magee v. Billingsley, 3 Ala. 679; Southern R. Co. v. Montgomery, 229 Ala. 456, 157 So. 854.

■ For the same reason the court properly sustained the State's objection to the question propounded on cross examination to State's witness Aaron as to whether Cora's husband was sent off to the penitentiary, and as to whether Cora's husband was living with her, Cora being the woman with whom Aaron was walking at the time he was seized.

Appellant's refused charges D3, D4, D5, D6, D7, D8, D9, E1, E3, E4, and E5, being affirmative in nature were properly refused under the developed evidence.

Charge E2 was properly refused, it pertaining to assault with intent to murder.

■ Charges A1, A3, D1, and D2, all pertaining to assault and battery being an offense included in a charge of mayhem were refused without error under the uncontradicted evidence of this case that the act of mayhem was complete. The appellant even admits the mayhem in his testimony, but seeks to avoid his guilt on the theory that the act was the independent act of Floyd. Edwards v. State, 33 Ala. App. 386, 34 So.2d 173; Riddle v. State, 25 Ala.App. 142, 142 So. 680; De Graaf v. State, 34 Ala.App. 137, 37 So.2d 130; Stallworth v. State, 155 Ala. 14, 46 So. 518; Kelly v. State, 235 Ala. 5, 176 So. 807.

■ Charge X is faulty in that a conspiracy to do an unlawful act is the criterion, not a conspiracy to do an act malum in se as specified in the charge. Further, the charge is not hypothesized upon the evidence. The charge is otherwise faulty, and misleading. No error resulted in its refusal.

■ Charge C8 was misleading, and also faulty in basing the overt act as the

probable outcome of the plan or design, and properly refused.

Charge C9 was properly refused as being an incorrect statement of a legal principle.

Charges A2, and A4 were properly refused as misleading. Further neither charge was hypothesized upon the evidence.

Charge A5 was faulty in that the object of the conspiracy could have been changed by his fellow conspirators, and his aiding or abetting could have arisen even though he did not participate in the actual castration.

Charges B2, and B3, were misleading in that they place a verdict of guilty solely upon the testimony of Miller and Griffin. The charges are also argumentative, in that there was an abundance of evidence other than the testimony of these two witnesses upon which the jury could find this appellant was connected with this crime. Further the law pertaining to the testimony of accomplices was covered in the court's oral charge.

Charge A8 was properly refused, as misleading and abstract in that no other person was named in the indictment.

Charge A7 was faulty, among other things, in basing guilt upon the jury's "belief" solely, rather than belief from the evidence.

Charges A9 and B1 would place appellant's guilt solely upon the acts of Floyd, rather than upon the act of any one of the members of the confederation. The appellant himself admitted that Aaron was castrated, though denying he knew who actually did the act. These charges were properly refused.

Charge A6 was properly refused. It omits consideration of any evidence as to any conspiracy that may have arisen after Aaron was seized.

Charges B4, B5, B6, B7, and B8 were properly refused as incorrect statements of legal principles involved. These charges would make appellant's guilt depend upon a specific intent to castrate Aaron as the overt act of the conspiracy, whereas, if the conspiracy is entered into to do a wrongful act, the execution of which renders it probable that a crime not specifically designated may result, each is responsible for everything which may consequently or proximately result from such unlawful purpose, whether it be specifically designated or not, and whether it be perpetrated by all or less of the conspirators. Cleveland v. State, 20 Ala.App. 426, 103 So. 707; Pearce v. State, 4 Ala.App. 32, 58 So. 996; Earnest v. State, 21 Ala.App. 534, 109 So. 613; Ray v. State, 32 Ala.App. 556, 28 So.2d 116; Skumro v. State, 234 Ala. 4, 170 So. 776; Stokley v. State, 254 Ala. 534, 49 So.2d 284.

During the closing argument of the Solicitor to the jury objections were interposed to the following statements by him:

"Listen to his honor, he is not going to say that assault is included in mayhem."

Defense counsel objected "to the statement of the Solicitor saying that assault and battery are not included in mayhem."

The statement of the Solicitor was not, as interpreted by defense counsel that assault and battery was not included in mayhem, but merely a statement that the court would not so charge in this case. In view of the uncontradicted evidence that the complete crime of mayhem was perpetrated, the prediction of the Solicitor, as applied to this case, was not incorrect.

"If those people gathered there at this defendant's house for the purpose of engaging in an unlawful act, and as a result of that conspiracy, the crime was committed; he is just as guilty as the one who did it."

While in somewhat abbreviated form, this statement by the Solicitor was not

wholly incorrect as a legal principle, made in the hurly burly of argument.

"Your honor is going to tell you, he is just as guilty as Bart Floyd, who actually is the one who" * * *

This interrupted statement is too fragmentary for consideration on review.

In connection with all the above statements, it must be observed that in his instructions to the jury the court specifically instructed that body that it was the court's duty to charge as to the law, and the duty of the jury to take the law as given by the court.

The court adequately instructed the jury as to the law of this case. It was the duty of the jury to look to this source for guidance. American Surety Co. of New York v. Hooker, 36 Ala.App. 39, 58 So.2d 469; Dixie Stage Lines v. Anderson, 222 Ala. 673, 134 So. 23.

■ We find nothing in the above statements by the Solicitor that would justify a reversal of this judgment because of the court's respective rulings in connection therewith.

Counsel for appellant also argues that this judgment should be reversed because of the prejudice to appellant resulting from the cumulative effect of various rulings and remarks by the trial judge during the progress of the trial below.

We have carefully studied this record in the light of such contention. We find nothing therein which, in our opinion, could rationally be construed as probably injuring the appellant in any of his substantial rights, whether such instances be considered separately, or cumulatively. Being clear to this conclusion we see no need to burden this opinion by any detailed exposition on this point. In fact, we are impressed after a study of this record with the successful effort of the trial judge to conduct this trial in an atmosphere of complete fairness and impartiality.

Affirmed.